IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| William Glenn Parker, | ) | C/A No.: 1:16-3852-TMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Nancy A. Berryhill,[1] Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this lawsuit.

I.    Relevant Background

A.    Procedural History

On August 21, 2012, Plaintiff protectively filed an application for DIB in which he alleged his disability began on June 30, 2011. Tr. at 98 and 140–41. His application was denied initially and upon reconsideration. Tr. at 99–102 and 105–09. On May 18, 2015, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Nicholas Walter. Tr. at 31–67 (Hr'g Tr.). The ALJ issued an unfavorable decision on July 24, 2015, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 12–29. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on December 9, 2016. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 65 years old at the time of the hearing. Tr. at 37. He obtained a Master's degree. Tr. at 39. His past relevant work ("PRW") was as a teacher, a coach, and an athletic director. Tr. at 184. He alleges he has been unable to work since June 30, 2011. Tr. at 39.

2.    Medical History

The record reflects that Plaintiff sustained a right posterior cerebral artery stroke in August 2009 that resulted in deficits to his visual field. Tr. at 287. He underwent coronary artery bypass grafting in or around 2009, as well. Tr. at 379.

Plaintiff presented to cardiologist Harry E. Hicklin, III, M.D. ("Dr. Hicklin"), on February 1, 2011, with complaints of shortness of breath with activity and mild right-sided chest discomfort. Tr. at 379. Dr. Hicklin scheduled Plaintiff for a nuclear exercise stress test and an echocardiogram ("echo"). Tr. at 380. He advised Plaintiff to hold off on restarting an exercise program and to follow a diet low in sodium, fat, and cholesterol. *Id.*

On February 7, 2011, the echo indicated normal left atrial size; normal left ventricular function with ejection fraction of 60%; mild aortic valve thickening with mild aortic insufficiency; and trivial mitral insufficiency. Tr. at 378. On February 25, 2011, a Lexiscan nuclear stress test indicated Plaintiff had evidence of inferior wall ischemia. Tr. at 377.

On March 12, 2011, Plaintiff denied chest pain and pressure. Tr. at 376. Dr. Hicklin indicated Plaintiff was stable and could begin a regular exercise program in an effort to lose 20 to 25 pounds. *Id.*

Plaintiff presented to neurologist Howard Mandell, M.D. ("Dr. Mandell"), on June 13, 2011. Tr. at 287–88. He reported that he had recently undergone cataract surgery and lens implant to his right eye. Tr. at 287. He indicated his ability to read had improved, but his peripheral vision had remained the same. *Id.* Dr. Mandell observed Plaintiff to have diminished reflexes in his arms and knees and absent reflexes in his ankles. *Id.* He explained to Plaintiff that his peripheral vision was not expected to improve with cataract removal and lens implant. Tr. at 288. He indicated Plaintiff had remained neurologically-stable. *Id.*

Plaintiff presented to Mack C. Poole, M.D. ("Dr. Poole"), on March 9, 2012. Tr. at 276. Dr. Poole indicated Plaintiff had reported some neurological problems that could be the result of diabetic neuropathy. *Id.* He stated Plaintiff was somewhat obese. *Id.* He assessed insulin-dependent diabetes mellitus, history of coronary artery disease, neuropathy of the trunk, hypertension, anxiety, and erectile dysfunction. *Id.*

On March 14, 2012, Dr. Mandell indicated Plaintiff had done well following his stroke, but continued to have visual field deficits. Tr. at 286. He noted Plaintiff had a pins-and-needles sensation in his feet and difficulty with balance. *Id.* He observed Plaintiff to have reduced sensation to pinprick and vibration in a stocking distribution. *Id.* On the same day, Plaintiff complained to Dr. Hicklin of exertional dyspnea and palpitations. Tr. at 299. Dr. Hicklin ordered an echo and myocardial perfusion imaging. Tr. at 300.

Plaintiff presented to Robert Wozniak, M.D. ("Dr. Wozniak"), on March 15, 2012, for treatment of diabetes. Tr. at 281. He reported uncontrolled diabetes, weight gain, blurred vision, cough, calf cramps, diarrhea, impotence, decreased memory, numbness, and unsteadiness. Tr. at 281–82. Dr. Wozniak observed Plaintiff to have 1+ edema and bilateral great toe dystrophic changes, but indicated no other abnormalities. Tr. at 282–83. He increased Plaintiff's dosages of Lantus Solo Star and Novolog Flex Pen to address his elevated hemoglobin A1c. Tr. at 283. Dr. Wozniak noted that Plaintiff needed to test his blood glucose at least three times per day and bring his results to his next visit. *Id.* He warned Plaintiff that if he did not "significantly improve his approach to DM," he would have to find another medical provider. *Id.*

On March 20, 2012, Plaintiff had a normal stress electrocardiogram ("EKG"), but abnormal myocardial perfusion imaging and single-photon emission computed tomography ("SPECT") myocardial perfusion imaging. Tr. at 297–98. The testing showed a small area of ischemia in Plaintiff's mid-inferior myocardial wall. Tr. at 298. On March 21, 2012, a bilateral carotid duplex scan showed Plaintiff to have minimal atheromatous disease. Tr. at 289.

On April 2, 2012, Plaintiff complained of chest discomfort and malaise. Tr. at 294. Dr. Hicklin observed no abnormalities on physical examination. Tr. at 295–96. He scheduled Plaintiff for a heart catheterization. Tr. at 296.

Plaintiff underwent left heart catheterization, coronary angiography, levocardiogram, vein graft angiography, and abdominal aortogram on April 5, 2012. Tr. at 292. The tests reveals native three-vessel coronary artery disease; mildly decreased left ventricular function with an ejection fraction of 45–50%; elevated end-diastolic pressure; patent left internal mammary artery to left anterior descending artery; patent vein graft to the right coronary artery; and mild tortuosity with insignificant disease. *Id.*

On October 2, 2012, Plaintiff reported high glucose in the morning and after meals. Tr. at 330. He complained of bruising, blurred vision, visual disturbance, diarrhea, impotence, back pain, decreased musculoskeletal range of motion ("ROM"), muscle cramps and weakness, decreased memory, dizziness, numbness, unsteadiness, and anxiety. Tr. at 331. Dr. Wozniak noted bilateral great toe dystrophic changes, but indicated no additional abnormal findings. Tr. at 332. He increased Plaintiff's dosages of

Lantus Solo Star to 60 units at bedtime; Novolog Flex Pen to 35 to 45 units three times a day; and Humulin N to 35 to 45 units at bedtime. Tr. at 332.

Plaintiff presented to Edgar DesChamps, III, M.D. ("Dr. DesChamps"), as a new patient on November 6, 2012. Tr. at 306. He reported increased appetite, fatigue, visual changes, extremity numbness, paresthesia, and erectile dysfunction and indicated a history of coronary artery disease, hyperlipidemia, hypertension, stroke, cataracts, and diabetes. *Id.* Dr. DesChamps observed Plaintiff to have a weak pulse in his bilateral posterior tibiales and dorsalis pedes and his left brachioradialis and patella, but noted no other abnormalities on physical examination. Tr. at 311–13.

Plaintiff followed up with Dr. DesChamps on January 16, 2013. Tr. at 317. He complained of blurred vision, joint stiffness, paresthesia, and tingling. Tr. at 318. His hemoglobin A1c was elevated at 8.1% and his glucose, blood urea nitrogen ("BUN"), potassium, creatinine, total cholesterol, triglycerides, high-density lipoprotein ("HDL") cholesterol, and estimated glomerular filtration ("eGFR") were also abnormal. Tr. at 321–22.

On January 18, 2013, Plaintiff reported that his blood glucose was running between 160 and 275 mg/dL each morning. Tr. at 326. He reported symptoms that included bruising, blurred vision, visual disturbance, impotence, muscle weakness, numbness, and unsteadiness. Tr. at 327. Dr. Wozniak observed Plaintiff to have bilateral great toe dystrophic changes, but noted no other abnormalities on physical examination. Tr. at 327–28. He increased Plaintiff's dosage of Humulin N to 40 units at bedtime and continued his other medications. Tr. at 328.

Plaintiff presented to Jeremy R. Burns, O.D. ("Dr. Burns"), for a consultative examination on March 5, 2013. Tr. at 338–39. Dr. Burns assessed Plaintiff's vision to be 20/20 on the right and 20/25 on the left with best correction. Tr. at 338. He stated Plaintiff had abnormal visual field and had no useful binocular vision with glasses. *Id.* He stated Plaintiff's diagnoses included left homonymous hemianopsia secondary to cerebrovascular accident ("CVA") and pseudophakia of both eyes. *Id.* Dr. Burns indicated Plaintiff would have difficulty seeing objects that were approaching from his left side. Tr. at 339.

On March 13, 2013, state agency consultant Larry Clanton, Ph. D. ("Dr. Clanton"), reviewed the record and completed a psychiatric review technique ("PRT"). Tr. at 72–73. He considered Listing 12.04 for affective disorders; determined Plaintiff had no restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace; and assessed his impairment as non-severe. *Id.* Catherine Blusiewicz, Ph. D. ("Dr. Blusiewicz"), reviewed the evidence and reached the same conclusions on July 26, 2013. Tr. at 88–89.

State agency medical consultant Dale Van Slooten, M.D. ("Dr. Van Slooten"), completed a physical residual functional capacity ("RFC") assessment on March 13, 2013. Tr. at 74–77. He found that Plaintiff could occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; frequently balance and climb ramps and stairs; and occasionally climb ladders, ropes, and scaffolds. Tr. at 74–

75. He stated Plaintiff should avoid jobs that require full visual fields for job performance and worker safety because of his visual impairment. Tr. at 76. He indicated Plaintiff should avoid concentrated exposure to extreme cold and heat, humidity, and hazards. *Id.* Stephen Burge, M.D. ("Dr. Burge"), a second state agency medical consultant, assessed the same physical RFC on September 4, 2013. Tr. at 90–92.

On April 5, 2013, Dr. Mandell noted that Plaintiff's diabetes was under good control. Tr. at 381. Plaintiff reported some pain in his hips when he walked and some paresthesia in his feet. *Id.* Dr. Mandell observed Plaintiff to have diminished reflexes in his arms and knees and absent reflexes in his ankles. *Id.* He stated Plaintiff had reduced sensation to pinprick and vibration in a stocking distribution. *Id.* He indicated Plaintiff was stable and no longer required neurological treatment. Tr. at 382.

On April 23, 2013, Plaintiff reported blurred vision, joint stiffness, paresthesia, and tingling. Tr. at 346. Dr. DesChamps noted no abnormalities on physical examination. Tr. at 351. He prescribed Librax and recommended that Plaintiff decrease his intake of caffeine and fatty foods to address symptoms of irritable bowel syndrome. Tr. at 353. He referred Plaintiff to a urologist and for lab work. *Id.* The lab work showed Plaintiff to have low testosterone and elevated hemoglobin A1c. Tr. at 357–58.

On August 24, 2013, state agency medical consultant Thomas S. Rowe, M.D. ("Dr. Rowe"), reviewed the evidence and assessed Plaintiff's physical RFC. Tr. at 92–95. He indicated Plaintiff had no exertional limitations, but should never climb ladders, ropes, or scaffolds. Tr. at 93. He stated Plaintiff had limited vision and did "not retain the visual fields to avoid hazards in the workplace." Tr. at 93–94. He stated the following:

> The claimant has a moderately severe visual impairment. The claimant will not be expected to avoid ordinary obstacles such as boxes and wires on the floor. The claimant retains ability to work with and handle large and small objects. The claimant should avoid work at unprotected heights and on ladders. The onset date can be set as 3-5-2103 [sic]. There is no evidence in the file to support an earlier onset date.

Tr. at 95.

On November 22, 2013, Dr. Wozniak noted that Plaintiff had resumed some part time work following his retirement. Tr. at 403. Plaintiff reported that his morning blood glucose had ranged from 180 to 300 mg/dL. *Id.* He complained of bruising, blurred vision, visual disturbances, diarrhea, impotence, decreased musculoskeletal ROM, joint pain, muscle weakness, decreased memory, dizziness, numbness, unsteadiness, and libido change. Tr. at 404. Plaintiff reported he felt a little unsteady on his feet and while driving. Tr. at 406. Dr. Wozniak indicated these symptoms appeared to be related to Plaintiff's history of CVA. *Id.* He observed Plaintiff to have decreased sensation to monofilament testing in both feet and bilateral great toe dystrophic changes. *Id.* He increased Plaintiff's dosage of Lantus Solo Star to 70 to 75 units at bedtime. *Id.*

Plaintiff presented to Lisa Carroll, M.D. ("Dr. Carroll"), to establish treatment on February 19, 2014. Tr. at 496. He reported diarrhea, erectile dysfunction, and poor balance. *Id.* Dr. Carroll noted that Plaintiff's creatinine had increased to 2.44 mg/dL. Tr. at 500. She instructed Plaintiff to discontinue use of angiotensin-converting enzyme ("ACE") inhibitors and Benazepril/Hydrochlorothiazide and referred him to a nephrologist. *Id.*

On February 28, 2014, Plaintiff reported that his blood glucose was sometimes low prior to lunch and typically ranged from 50 to 150 mg/dL. Tr. at 398. He complained of bruising, blurred vision, snoring, diarrhea, impotence, decreased musculoskeletal ROM, muscle weakness, dizziness, numbness, unsteadiness, and anxiety. Tr. at 399. Dr. Wozniak observed Plaintiff to have decreased monofilament sensation in his bilateral feet and bilateral great toe dystrophic changes. Tr. at 401. He indicated Plaintiff's glycemic control had improved and instructed him to decrease his dosages of Lantus Solo Star to 60 units and Novolog Flex Pen to 25 units. *Id.*

Plaintiff presented to nephrologist Muhammad Ebrahim, M.D. ("Dr. Ebrahim"), for a new patient consultation on March 10, 2014. Tr. at 387. He complained of fatigue, diarrhea, muscle weakness, and arthritis. Tr. at 389. Dr. Ebrahim indicated Plaintiff's chronic kidney disease was likely caused by his history of diabetes and poorly-controlled hypertension. Tr. at 391. He instructed Plaintiff to follow a low potassium diet, to drink more water, and to avoid nonsteroidal anti-inflammatory drugs ("NSAIDS"). *Id.* He prescribed Benazepril-Hydrocholorothiazide 20-25 mg and Levothyroxine Sodium 75 mcg and referred Plaintiff to a dietician and to the chronic kidney disease clinic. *Id.*

On March 19, 2014, Plaintiff reported that he had recently sustained a fall. Tr. at 492. He indicated his blood sugar was 70 mg/dL after the fall and that his endocrinologist had subsequently reduced his dosages of Novolog and Lantus. *Id.* Dr. Carroll questioned whether Plaintiff's dizziness was secondary to his low heart rate, as opposed to hypoglycemia. Tr. at 494. She decreased his dosage of Metoprolol to address symptomatic bradycardia. *Id.*

On April 21, 2014, Plaintiff reported blurred vision and occasional lightheadedness with standing. Tr. at 488. Dr. Carroll observed him to be bradycardic and to have some facial scaling and erythema. Tr. at 490. She instructed Plaintiff follow up with cardiologist Stephen Cherry, M.D. ("Dr. Cherry"), the next day and to visit the emergency room if he experienced dizziness or chest pain prior to the appointment. *Id.*

Plaintiff presented to Dr. Cherry on April 22, 2014. Tr. at 394. Dr. Cherry observed 1+ bilateral edema, but indicated no additional abnormalities. Tr. at 395–96. He stated Plaintiff was seemingly doing well with no angina or symptoms of heart failure, but he noted that Plaintiff had an abnormal EKG with inferolateral T-wave inversion. Tr. at 396. He scheduled Plaintiff for an echo and a walking Lexiscan nuclear stress test. *Id.* On April 29, 2014, the echo showed normal left ventricular ejection fraction of 68% with grade-two diastolic dysfunction and trace mitral regurgitation. Tr. at 439–40.

Plaintiff presented to Dr. Carroll on September 4, 2014, for cramping in his bilateral legs and possible dehydration. Tr. at 480. He reported that he had been coaching football and feared that he had either become dehydrated or strained something while running. *Id.* Dr. Carroll observed Plaintiff to have facial scaling and erythema. Tr. at 482. She indicated Plaintiff had likely sustained a strain and she encouraged him to stretch before engaging in exercise. *Id.* She diagnosed actinic keratosis and referred Plaintiff to a dermatologist. *Id.*

On September 18, 2014, Dr. Carroll observed Plaintiff to have decreased sensation to monofilament testing in his bilateral distal toes. Tr. at 475. She instructed Plaintiff to continue his current routine and to follow up in six months. Tr. at 476.

Plaintiff reported persistent pain on the left side of his back on January 7, 2015. Tr. at 461. He indicated his fasting blood glucose ranged from 120 to 200 mg/dL. *Id.* Dr. Carroll observed Plaintiff to have decreased sensation to monofilament testing in his distal toes bilaterally. Tr. at 463. Plaintiff complained of significantly painful paresthesia, and Dr. Carroll indicated she would increase his dosage of Gabapentin and would consider Lyrica or Cymbalta for worsening symptoms. Tr. at 464.

Plaintiff presented to Dr. Carroll on March 19, 2015, after having sustained a fall. Tr. at 451. He reported pain in his knees and right shoulder. *Id.* Dr. Carroll observed Plaintiff to demonstrate an unsteady gait and to have medial tenderness and swelling in his left knee. Tr. at 453. She stated Plaintiff's blood pressure and heart rate were low to low-normal. *Id.* She instructed Plaintiff to hold off on taking Metoprolol. *Id.*

Plaintiff presented to Dr. Carroll on April 2, 2015, for problems with his gait and balance. Tr. at 446. He described a recent episode of dizziness and unsteadiness on his feet. *Id.* He also complained of left knee pain. *Id.* Dr. Carroll instructed Plaintiff to monitor his blood pressure and blood glucose closely and indicated she would refer him to neurologist Bogdan P. Gheorghiu, M.D. ("Dr. Gheorghiu"), for dizziness. Tr. at 449. She planned to refer Plaintiff to an orthopedist for knee pain. *Id.*

On April 16, 2015, Plaintiff complained of left knee pain that was exacerbated by walking, standing, ascending stairs, bending, and twisting and was associated with weakness, numbness, swelling, redness, warmth, and decreased ROM. Tr. at 441. Dr. Carroll observed Plaintiff to have an unsteady gait and medial tenderness, swelling, and painful ROM in his left knee. Tr. at 443. She expressed concern that Plaintiff might have

a meniscal injury. *Id.* She prescribed Norco and referred Plaintiff for magnetic resonance imaging ("MRI") and to an orthopedist. *Id.*

Plaintiff presented to Dr. Gheorghiu for a new patient evaluation on April 22, 2015. Tr. at 408. He reported dizziness, falling, and feeling off balance. Tr. at 408. Dr. Gheorghiu observed Plaintiff to have unsteady gait; positive Romberg's sign; absent biceps, brachioradialis, triceps, patellar, and ankle jerk deep tendon reflexes; no clonus; absent Babinski's reflex; and decreased sensation to light touch, pinprick, and vibration/proprioception in his bilateral lower extremities. Tr. at 409.

On April 23, 2015, Plaintiff reported to Robert MacDonald, M.D. ("Dr. MacDonald"), that he had sustained three recent falls. Tr. at 422. He indicated that prior to each incident, he had been walking or standing when his legs gave way and caused him to fall to the floor. *Id.* Dr. MacDonald observed Plaintiff to have trace bilateral edema. Tr. at 424. An EKG showed sinus bradycardia, an old anteroseptal infarct, nonspecific sinus tachycardia depression, and possible anterolateral ischemia. Tr. at 413. He stated Plaintiff's symptoms were suggestive of transient decreased cerebral perfusion or brainstem transient ischemic attack. Tr. at 425. He instructed Plaintiff to decrease his dose of Metoprolol to half a tablet daily and to use a four-week cardiac event monitor. *Id.*

Plaintiff presented to orthopedic surgeon Frank M. Armocida, M.D. ("Dr. Armocida"), on April 24, 2015, for left knee pain. Tr. at 507. Dr. Armocida observed Plaintiff to ambulate with an antalgic gait favoring his left side; to be tender in his medial joint line and proximal medial tibia; to be mildly tender in his lateral joint line; to have a small effusion; to have positive McMurray's test; to have extension to 125 degrees of

flexion; and to have no medial instability. Tr. at 511. He stated Plaintiff's x-rays and presentation were most consistent with left knee pain, mild radiographic osteoarthritis, and probable degenerative meniscus tear. *Id.* He instructed Plaintiff to follow up after the MRI. *Id.*

On April 28, 2015, Dr. Armocida noted that the MRI of Plaintiff's left knee showed no meniscal pathology, but some chondromalacia of the medial patella, a medial plica, and a metallic artifact from a history of medial collateral ligament repair. Tr. at 503. Dr. Armocida observed Plaintiff to have medial joint line tenderness, trace effusion, full extension, and no instability. Tr. at 505. He diagnosed left knee arthritis and synovitis and administered a Kenalog injection. Tr. at 506.

On July 13, 2015, electromyography ("EMG") and nerve conduction studies ("NCS") suggested Plaintiff had diffuse sensorimotor peripheral neuropathy. Tr. at 515.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on May 18, 2015, Plaintiff testified that he had retired from Rock Hill High School at the end of the 2010–2011 school year. Tr. at 40. He indicated he chose to retire because the school's principal did not think he could continue to perform his job. *Id.* He stated he was finding it difficult to travel to athletic events and had to rely on others to drive him. *Id.* He indicated he had difficulty remembering how to get to other schools for events even though he had traveled to them many times in the past. *Id.* He stated that he had failed to complete reports and file forms on time. Tr. at 40–41. He

indicated he was unable to lift and carry sporting goods packages to deliver to coaches. Tr. at 54. He stated he had sustained a fall while working. Tr. at 52–53.

Plaintiff testified that he had suffered a stroke in August 2009 and was subsequently out of work for a month to a month-and-a-half. Tr. at 44. He indicated he followed up with a neurologist who confirmed through an MRI report that he had actually sustained two strokes, including one in his optic nerve. Tr. at 45. He endorsed symptoms following his strokes that included visual disturbance, memory problems, and a tingling sensation from his head to his left foot. *Id.* He indicated the tingling sensation on his left side worsened when he engaged in prolonged walking. *Id.* He stated Gabapentin provided some relief, but did not make the feeling go away. *Id.* He testified that he took blood thinners and low-dose aspirin and engaged in exercise to prevent further strokes. Tr. at 46. He stated that he had sustained three falls and had injured his knee as a result of the most recent one. *Id.*

Plaintiff testified that he had undergone triple bypass surgery and was out of work for approximately three to four weeks during the 2009–2010 school year. Tr. at 46–47. He acknowledged that he had undergone a heart catheterization around April 2012, but had not required stents or angioplasty. Tr. at 47. He indicated he had no difficulty seeing items that were directly in front of him, but had a cloudy field of vision and impaired peripheral vision in his left eye. Tr. at 38. He indicated he had chronic kidney disease that was treated through a low-calorie diet. Tr. at 49. He stated he had noticed residual weakness in his left arm since his strokes. Tr. at 57.

Plaintiff estimated that he could walk for 20 to 30 minutes on a level surface. Tr. at 51 and 56. He indicated his vision problems presented some difficulty when he attempted to walk on non-level surfaces. *Id.* He stated he could carry 15 pounds. Tr. at 54. He indicated he was no longer able to use his left arm to type. Tr. at 57.

Plaintiff confirmed that he took medication for hypertension that effectively controlled his blood pressure. Tr. at 48. He indicated he took Citalopram, but had not required any changes in his dosage. *Id.* He confirmed that he took medication for hypothyroidism and diabetes. Tr. at 49. He stated that he sometimes had to take a higher dose of medication because his blood sugar was elevated. *Id.*

Plaintiff testified that he had worked in athletics for 25 to 30 years as an athletic director, an assistant athletic director, a football coach, a defensive coordinator, and a weight training instructor. Tr. at 41 and 43. He stated he was certified to teach driver's education, physical education, and health. Tr. at 43. He indicated he had worked mostly in public schools, but had served as a coach and athletic director at Wofford College for a total of seven years. Tr. at 41. He stated he had served as an athletic director at several public schools and that each job had involved different duties. *Id.* He indicated that some school principals expected him to mow the athletic fields as part of his job duties. Tr. at 42. He stated a maintenance crew mowed the practice fields at Rock Hill High School, but that it was necessary for him to mow the grass more frequently to keep it low. *Id.* He indicated he had hoped to continue to work for an additional four years. Tr. at 47 and 55.

Plaintiff testified that he continued to drive, but did not travel to unfamiliar places. Tr. at 38. He indicated he did not drive in heavy traffic and did not often drive at night

because of his vision problems. Tr. at 38–39. He indicated he had previously been very active, but was no longer able to play tennis or racquetball, throw a football, or shoot a basketball. Tr. at 50. He stated he was no longer able to go hiking with his wife or to dock his pontoon boat. Tr. at 51.

b. Vocational Expert Testimony

Vocational Expert ("VE") G. Roy Sumpter, Ph. D., reviewed the record and testified at the hearing. Tr. at 60–65. The VE explained that Plaintiff's past work as an athletic director would be classified by *Dictionary of Occupational Titles* ("*DOT*") number 090.117-022, as sedentary with a specific vocational preparation ("SVP") of nine. Tr. at 61. However, he indicated the job was heavy as described by Plaintiff. *Id.* He described Plaintiff's work as a coach, *DOT* number 153.227-018, as medium with an SVP of seven and his job as a teacher as light with an SVP of seven. *Id.* The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform work at the medium exertional level; frequently climb ramps or stairs; occasionally climb ladders, ropes, or scaffolds; frequently balance; would be unable to perform jobs that require full visual field for job performance or worker safety; could avoid ordinary hazards like boxes on the floor and doors ajar; could not be exposed to extreme heat or cold or concentrated humidity; and should avoid hazards such as unprotected heights and moving mechanical parts. Tr. at 61–62. The VE testified that the hypothetical individual could perform jobs of athletic director and teacher as those jobs are described in the *DOT*, but would be unable to perform Plaintiff's PRW as actually performed because of the temperature and visual restrictions. Tr. at 62. The ALJ asked whether there were any

other jobs in the national economy that the hypothetical person could perform. *Id.* The VE identified medium jobs with an SVP of two as a sweeper/cleaner, *DOT* number 389.683-010, with one million positions in the economy; a metal furniture assembler, *DOT* number 709.684-014, with 207,000 positions in the economy; and a hand packer, *DOT* number 920.587-018, with 335,000 positions in the economy. Tr. at 62–63.

For a second hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who was limited to work at the light exertional level and as otherwise described in the first hypothetical question, except was restricted to occasional balancing. Tr. at 63. He asked if the individual could perform Plaintiff's PRW. *Id.* The VE responded that the individual would be unable to perform Plaintiff's PRW as actually performed, but would be able to perform the jobs of athletic director and teacher as generally performed in the national economy. *Id.*

For a third hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who was limited to work at the sedentary exertional level. Tr. at 64–65. He asked if the individual would be able to perform Plaintiff's PRW. Tr. at 65. The VE indicated the individual could perform Plaintiff's PRW as an athletic director as generally performed, but would be unable to perform his PRW as a teacher. *Id.* The ALJ asked the VE to assess the effect of a restriction to simple, routine tasks. *Id.* The VE indicated the individual would be unable to perform Plaintiff's PRW. *Id.*

### 2. The ALJ's Findings

In his decision dated July 24, 2015, the ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on June 30, 2015.
2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of June 30, 2011 through his date last insured of June 30, 2015 (20 CFR 404.1571 *et seq.*).
3. Through the date last insured, the claimant had the following severe impairments: cerebral vascular accident; ischemic heart disease; diabetes and degenerative joint disease of the left knee (20 CFR 404.1520(c)).
4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except frequently climb ramps or stairs; occasionally climb ladders, ropes or scaffolds and balance; no jobs that require full visual field for job performance and worker safety, but can avoid ordinary hazards like boxes on the floor and doors ajar; no extreme heat, cold, humidity and no hazards.
6. Through the date last insured, the claimant was capable of performing past relevant work as an athletic director or teacher. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).
7. The claimant was not under a disability, as defined in the Social Security Act, at any time from June 30, 2011, the alleged onset date, through June 30, 2015, the date last insured (20 CFR 404.1520(f)).

Tr. at 17–23.

II.     Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)     the ALJ erred in concluding that Plaintiff could perform his PRW;

2)     the evidence does not support the ALJ's finding that Plaintiff had the RFC to perform light work;

3)     substantial evidence does not support the ALJ's assessment of Plaintiff's credibility;

4)     the ALJ did not properly assess Plaintiff's mental RFC; and

5) the Medical-Vocational Rules direct a finding that Plaintiff is disabled.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such

---

[2]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a

impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from

claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the

Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.      Analysis

1.      Ability to Perform PRW

Plaintiff argues the ALJ erred in concluding that he could perform his PRW. [ECF No. 11 at 18]. He maintains that his PRW was a composite job and that the ALJ erred in finding he could meet its requirements because he was unable to meet all of its demands as previously performed. *Id.* He contends the ALJ made no specific factual findings as to the physical and mental demands of his PRW. *Id.* at 18–19.

The Commissioner argues the VE's testimony supports a finding that Plaintiff could perform his PRW as an athletic director, which is generally performed at the sedentary exertional level and his PRW as a teacher, which is generally performed at the light exertional level. [ECF No. 12 at 17]. She contends the ALJ was not required to find that Plaintiff could perform his PRW as actually performed. *Id.* at 17–18. She maintains the ALJ did not have to consider Plaintiff's argument that his PRW was that of a coach, as opposed to a teacher, because Plaintiff provided no evidence to rebut the VE's classification of the job. *Id.* at 18.

A claimant will generally be found "not disabled" if his RFC allows him to meet the physical and mental demands of his PRW as actually performed or as described by

the *DOT* as customarily performed throughout the economy. SSR 82-62. "Past work experience must be considered carefully to assure that the available facts support a conclusion regarding the claimant's ability or inability to perform the functional activities required in this work." *Id.*

To determine the claimant's ability to perform PRW, the ALJ must carefully evaluate the claimant's statements as to which PRW requirements can no longer be met and the reasons for his inability to meet those requirements; medical evidence establishing how the impairment limits the claimant's ability to meet the physical and mental requirements of the work; and in some cases, supplementary or corroborative information from other sources such as employers, the *DOT*, etc., on the requirements of the work as generally performed in the economy. *Id.* Because a determination as to whether a claimant can perform PRW is important and sometimes even controlling, it is very important that the ALJ make every effort "to secure evidence that resolves the issue as clearly and explicitly as circumstances permit." *Id.* The adjudicator must make the following specific findings of fact to support a determination that the claimant can perform PRW: (1) a finding of fact as to the claimant's RFC; (2) a finding of fact as to the physical and mental demands of PRW; and (3) a finding of fact that the individual's RFC would permit a return to his PRW. *Id.*

The ALJ found that Plaintiff was capable of performing PRW as an athletic director or teacher. Tr. at 23. He indicated the job of athletic director, *DOT* number 090.117-022, was sedentary in exertional level and skilled in complexity and the job of teacher, *DOT* number 091.227-010, was light in exertional level and skilled in

complexity. *Id.* He relied on the VE's testimony to conclude that Plaintiff was capable of performing PRW as an athletic director and teacher as "normally performed." *Id.* He found that "[t]his work did not require the performance of work-related activities precluded by the claimant's residual functional capacity." *Id.*

Plaintiff argues the ALJ erred in considering his PRW as individual jobs with specific *DOT* numbers, as opposed to composite jobs. [ECF No. 11 at 18]. "Composite jobs have significant elements of two or more occupations and as such, have no counterpart in the *DOT*." *Program Operations Manual System* ("*POMS*") DI 25005.020B. "In the event the main duties of past relevant work can only be described by considering multiple *DOT* occupations, a plaintiff may be considered to have performed a composite job." *Shealy v. Colvin*, No. 8:13-2383-RMG, 2015 WL 467726, at *12 (D.S.C. Feb. 4, 2015), citing *Plumb v. Astrue*, No. 8:10-3090-RBH, 2012 WL 768058, at *6 (D.S.C. Mar. 7, 2012) (remanding with instruction that the ALJ must determine whether the plaintiff's PRW was a composite job); *POMS* 25005.020B. If an ALJ determines that a claimant's PRW was a composite job, he must explain how he reached that conclusion. *POMS* 25005.020B. An ALJ can only find a claimant capable of performing PRW that was a composite job if he can perform all parts of the job. *Id.* Because the composite job has no *DOT* number, its component jobs should not be considered "as generally performed in the national economy." *Id.*

In *Shealy*, 2015 WL 467726, at *13, the court noted other courts outside the Fourth Circuit had "held that an ALJ may not deem a Plaintiff capable of performing past relevant work by dividing the demands of a composite job into two separate jobs and

finding him or her capable of performing the less demanding of the two jobs." *See Vertigan v. Halter*, 260 F.3d 1044, 1051 (9th Cir. 2001); *Valencia v. Heckler*, 751 F.2d 1082, 1086 (9th Cir. 1985); *Roberts v. Astrue*, No. 8:08-120-17EAJ, 2009 WL 722550, at *3 (M.D. Fla. Mar. 18, 2009). This court has generally considered remand appropriate where substantial evidence suggests the plaintiff might have performed a composite job and the ALJ failed to resolve the issue. *See Shealy*, 2015 WL 457726 (finding the ALJ erred in failing to assess whether the plaintiff's PRW was a composite job where she "always" performed job duties of an order clerk in conjunction with duties of a material handler or store laborer); *Plumb*, 2012 WL 768058 (remanding the case for consideration of whether Plaintiff's PRW as a liquor store owner/operator was a composite job where the VE classified it as involving owner/management type duties that would be classified under one *DOT* number and stock clerk duties that would be classified under a second *DOT* number); *but see Miles v. Astrue*, No. 8:07-3164-RBH, 2009 WL 890651, at *12–13 (D.S.C. Mar. 30, 2009) (finding no error in the ALJ's failure to evaluate whether the plaintiff's PRW was a composite job where she testified that the main duty of her PRW was as a data entry clerk and she only performed inventory work on one Saturday per month).

Plaintiff's testimony suggests he likely performed composite jobs in the vocationally-relevant past. *See* Tr. at 43 (testifying that he coached football and taught in the weight training program while employed at Dorman High School and served as an assistant athletic director and football coach during a prior period of employment at Rock Hill High School). Because the record suggests Plaintiff performed jobs as a coach and a

teacher in combination, the ALJ erred in determining Plaintiff could perform PRW as a teacher without considering whether the job of teacher was performed as part of composite job.

Although Plaintiff performed the job of assistant athletic director in conjunction with a job as a coach, he also testified that he was "an athletic director totally" during "the last few years" (Tr. at 39) and stated his job from 2007 through 2011 was "[f]ull-time AD" (Tr. at 42–43). Thus, to the extent that Plaintiff argues his job as an athletic director was a composite job because he performed it at the same time as he was a teacher or coach, his testimony conflicts with his argument.

Nevertheless, Plaintiff's description of his PRW as an athletic director differs from the *DOT*'s description of the job. He described the job as follows: "[s]upervise coaches, counsel parents, monitor athletes' academics, advise booster club, keep records, respond to emails, order equipment, mow fields, help with concessions, arrange travel, schedule games." Tr. at 185. He indicated the job required he walk for three hours, stand for three hours, and sit for four hours per day. *Id.* He stated he occasionally climbed when stocking equipment. *Id.* He indicated he would stoop for two hours; kneel for one hour; crouch for one hour; reach for two hours; handle, grab, or grasp large objects for half an hour; and write, type, or handle small objects for two hours per day. *Id.* He stated he was expected to lift boxes of uniforms and equipment and concession items and equipment. *Id.* He estimated he frequently lifted 15 pounds and lifted up to 50 pounds. *Id.* He indicated he spent 70 percent of his time supervising others and hired and fired coaches and administrative assistants. *Id.*

The *DOT* provides the following description for an athletic director:

Plans, administers, and directs intercollegiate athletic activities in college or university; interprets and participates in formulating extramural athletic policies. Employs and discharges coaching staff and other department employees on own initiative or at direction of board in charge of athletics. Directs preparation and dissemination of publicity to promote athletic events. Plans and coordinates activities of coaching staff. Prepares budget and authorizes department expenditures. Plans and schedules sports events, and oversees ticket sales activities. Certifies reports of income produced from ticket sales. May direct programs for students of physical education.

090.117-022, DIRECTOR, ATHLETIC. *DOT* (4th ed., revised 1991), 1991 WL 646873. It classifies the job as being in the sedentary strength category and specifies "[n]ot [p]resent—[a]ctivity or condition does not exist" with respect to climbing, stooping, kneeling, crouching, reaching, and fingering. *See id.*

Plaintiff described some duties that were similar to those indicated in the *DOT*. His indication that he supervised coaches was consistent with the component in the *DOT* for planning and coordinating activities of coaching staff. *Compare* Tr. at 185, *with* 1991 WL 646873. His notation that he hired and fired coaching staff and other departmental employees was also consistent with the *DOT*'s job description. *Compare* Tr. at 185, *with* 1991 WL 646873. His acknowledgment that he scheduled games and ordered equipment was generally consistent with the *DOT*'s requirement that an athletic director authorize department expenditures and plan and schedule sporting events. *Compare* Tr. at 185, *with* 1991 WL 646873.

However, comparing Plaintiff's description of his job to the *DOT*'s description of the job of athletic director reveals some significant differences, as well. Although Plaintiff testified that he had worked as a head football coach and athletic director at

28

Wofford College in the remote past (Tr. at 41), he stated he had worked as a high school athletic director in the vocationally-relevant past. *See* Tr. at 42–43. The *DOT*'s description specifically pertains to a college or university setting. *See* 1991 WL 646873. Plaintiff specified that he engaged in several activities that were not included in the *DOT*'s job description, but the two that stand out are mowing fields and helping with concessions. *Compare* Tr. at 185, *with* 1991 WL 646873. He also described standing, walking, lifting, and postural requirements that were more strenuous than those described in the *DOT*. *Compare* Tr. at 185, *with* 1991 WL 646873.

> The court recently explained the following:

> [C]ourts in this circuit have recognized that when a plaintiff's past relevant work does not properly fall within a *DOT* classification, either because the plaintiff performed a so-called "composite" job with duties crossing over various *DOT* classifications or because she did not perform the main duties of the *DOT* classified job identified by the vocational expert, then the ALJ should not consider whether a plaintiff can perform her past relevant work as it is generally performed in the national economy based on a *DOT* classification. Rather, some courts have suggested that an ALJ in such cases is limited to determining whether the claimant can perform her past relevant work as she performed it.

*Eklund v. Berryhill*, No. 0:16-872-BHH-PJG, 2017 WL 3405654, at *4 (D.S.C. Jul. 25, 2017), adopted by 2017 WL 3394151 (D.S.C. Aug. 8, 2017), citing *Shealy*, 2015 WL 467726, at *11–13. It noted "[t]his seems especially to be the case when the *DOT* classification used by the vocational expert is at a less strenuous exertional level than the actual job performed by the plaintiff as she describes it." *Id.*, citing *Turrentine v. Colvin*, No. 1:15-256, 2016 WL 225699 (M.D.N.C. Jan. 19, 2016) (finding that because, among other reasons, the plaintiff's past relevant work as she described it was at the light

exertional level, including walking up to six hours per day and seldom sitting at a computer, whereas the *DOT* occupation used by the vocational expert and the ALJ qualified as sedentary, substantial evidence failed to support the ALJ's use of the *DOT* classification in analyzing the plaintiff's past relevant work); *DeLoatche v. Heckler*, 715 F.2d 148, 151 (4th Cir. 1983) (noting that job labels provided by employers may not be consistent with classifications in the *DOT* and providing that a claimant may refute the VE's job identification by demonstrating that his job duties differed from those described in the *DOT*).

The record is insufficient for the undersigned to determine whether Plaintiff's PRW as a high school athletic director would be considered a composite job, would fall outside the *DOT*'s job descriptions, or would be better classified by another *DOT* description. The ALJ did not make specific findings regarding the physical and mental demands of Plaintiff's PRW as required by SSR 82-61. *See* Tr. at 23. While he acknowledged that Plaintiff had served as an athletic director, a coach, and a teacher in the vocationally-relevant past, he did not address the specific demands of these jobs or Plaintiff's statements as to his reasons for being unable to meet those demands. In light of the foregoing, the undersigned recommends the court remand the case for further consideration of Plaintiff's ability to perform his PRW.

### 2.    Ability to Perform Light Work

Plaintiff argues that substantial evidence does not support the ALJ's finding that he could perform light work. [ECF No. 11 at 16]. He maintains that his medical records

and testimony establish that he is incapable of performing substantially all of the activities required for light work. *Id.*

The Commissioner contends the ALJ's RFC finding is supported by benign physical examinations, unanimous medical opinions, and Plaintiff's reported ADLs. [ECF No. 12 at 14].

The ALJ indicated the RFC he assessed was "generally consistent with the most recent evaluation by State agency medical consultants for the claimant's physical ability (Exh. 4A)," but that he had "assigned additional limitations regarding lifting and carrying because of balance issues reflected in the medical evidence suggesting the additional lifting and carrying requirements of medium work up to 50 pounds occasionally could present some hazards." Tr. at 22. He stated the RFC he assessed was supported by objective evidence and medical records that "predominantly indicate normal gait and consistently mention exercise, regular walking and weight lifting with dumbbells." Tr. at 22–23. He cited Plaintiff's abilities to coach football and to run and noted they "call[ed] into question allegations of severity with regard to mental (memory), vision, and physical capability and balance." Tr. at 23.

Although the ALJ cited evidence to support the RFC he assessed, his evaluation of the evidence is deficient for a couple of reasons. First, the ALJ failed to acknowledge objective evidence of impaired gait, balance problems, and vascular and sensory deficits in Plaintiff's lower extremities that could reasonably affect his ability to meet the standing and walking requirements of light work. *See* Tr. at 286 and 381 (noting reduced sensation to vibration and pinprick in a stocking distribution); Tr. at 312 (indicating weak

pulse in the bilateral posterior tibiales and dorsalis pedes and the left brachioradialis and patella); Tr. at 401 and 406 (noting reduced sensation to monofilament testing in both feet and bilateral great toe dystrophic changes); Tr. at 409 (indicating unsteady gait and absent deep tendon reflexes); Tr. at 443, 451, and 507 (observing ambulation with unsteady or antalgic gait); Tr. at 463 and 475 (noting decreased sensation to monofilament testing in bilateral distal toes); Tr. at 515 (suggesting diffuse sensorimotor peripheral neuropathy on EMG and NCS).

Second, although the ALJ stated he accepted the state agency medical consultant's assessment of Plaintiff's RFC at Exhibit 4A with additional lifting and carrying restrictions, he actually rejected a significant limitation in Dr. Rowe's physical RFC assessment. Dr. Rowe indicated that because of his visual limitations, Plaintiff could "not be expected to avoid ordinary obstacles such as boxes and wires on the floor." Tr. at 95. However, the ALJ specifically indicated in his RFC assessment that Plaintiff could "avoid ordinary hazards like boxes on the floor and doors ajar." Tr. at 20. In the absence of an explanation from the ALJ, it is unclear whether he intentionally rejected the limitation or merely missed it in reviewing the record.

Therefore, the undersigned recommends the court find the ALJ's assessment of Plaintiff's physical RFC is not supported by substantial evidence to the extent that it fails to reflect his consideration of the entire record or to reconcile conflicting evidence.

### 3.    Additional Allegations of Error

Plaintiff argues the ALJ failed to cite specific evidence to support a finding that his statements were not entirely credible. [ECF No. 11 at 13]. He maintains the ALJ did

not consider his ability to meet the basic mental demands of unskilled work in accordance with the provisions of SSRs 96-8p and 85-15. *Id.* at 17. He contends the evidence proves he was limited to sedentary work and that Medical-Vocational Rule 201.06 directs a finding that he is disabled. *Id.* at 20.

Having found remand appropriate based on error in the ALJ's assessment of Plaintiff's RFC and ability to perform PRW, the undersigned declines to address his additional allegations.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

August 24, 2017                                 Shiva V. Hodges
Columbia, South Carolina                  United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).